Sam Samkoff v. Commissioner.
Samkoff v. Commissioner
Docket No. 54266.
United States Tax Court
T.C. Memo 1956-251; 1956 Tax Ct. Memo LEXIS 41; 15 T.C.M. (CCH) 1283; T.C.M. (RIA) 56251; November 14, 1956
*41 Held: (1) The Commissioner was justified in computing taxpayer's net income by the net worth method. (2) Amount of undeposited cash at beginning of net worth period determined. (3) Additions to deficiencies because of fraud with intent to evade tax sustained. James A. Ronayne, Esq., 120 Broadway, New York, N. Y; for the petitioner. John J. Walsh, Esq., and John M. Doukas, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax for the years 1942, 1943, and 1945, and 50 per cent additions to the deficiencies under section 293(b), 1939 Code, as follows: Year
Deficiency
Sec. 293(b)
1942
$ 3,084.71
$1,542.36
1943
4,187.41
2,093.71
1945
9,201.60
4,600.80
$16,473.72
$8,236.87
The questions to be decided are (1) Whether petitioner realized income in each of the taxable years which he failed to report; and (2) Whether any part of a deficiency is due to fraud with intent to evade tax. The Commissioner, under section 272(e), has made claim for the increase in the deficiency for 1943, and for increase in the amount of the 50 per cent addition to the deficiency *42 under section 293(b). Findings of Fact The petitioner is a resident of New York City, New York. He filed income tax returns for the years 1943, 1944, and 1945, with the collector of internal revenue for the fourteenth district of New York. Petitioner's return for 1942 was filed with the collector of internal revenue for the third district of New York. The statutory notice of deficiency was mailed to petitioner on May 28, 1954. Consents, Form 872, fixing the period of limitation upon assessment of tax for 1943, 1944, and 1945, were duly executed by the petitioner and the Commissioner extending the statute of limitations for assessment to June 30, 1954. Petitioner is about 62 years old. He was born in Lithuania. He has three brothers, Seymour, Tobias, and Julius, and a sister, Esther. Petitioner had two or three years schooling in Lithuania. He left school when he was twelve to work in a family wholesale and retail grocery business in Europe. He came to the United States in 1912, when he was eighteen, with his mother, Tobias, Seymour, and Esther. Petitioner's father and his brother Julius came to the United States in about 1908. A family grocery business was established in *43 New York City in about 1912. Petitioner's father Max, Julius, petitioner, and possibly other members of the family were engaged in this business. The business was known as Max Samkoff and Sons, and it was operated as a partnership. In the late 1920's, a corporation was formed to take over the business. After 1933, and prior to June 30, 1935, a new corporation, M. Samkoff's Sons, Inc., operated the business. The corporations carried on a wholesale grocery business at 533 East 133 Street, New York City. Income tax returns filed by the abovenamed corporations reported that petitioner was president in 1927 and from June 30, 1936 to June 30, 1939, and he was treasurer in the years 1928-1930. On June 30, 1943, M. Samkoff's Sons, Inc., purchased all of the stock in the corporation owned by petitioner, Julius, and Esther, for a consideration which is set forth hereinafter. The Samkoff corporations filed Federal income tax returns. For the years 1927-1930 and 1933, income was reported on a calendar year basis; for the years 1936 and 1939-1942, income was reported on the basis of a fiscal year ending on June 30. The corporate returns for the above years showed that petitioner, Seymour, *44 Julius, and Tobias were equal stockholders in Max Samkoff & Sons, Inc., and that petitioner, Esther, and the other three brothers were equal stockholders in M. Samkoff's Sons, Inc. The returns do not show that the corporations distributed dividends in any of the above-stated years. The following schedule, made up from income tax returns of the corporation, shows the income or loss which was reported by the Samkoff corporations and the salaries paid to petitioner, his three brothers, and to Esther (in one year): Salaries
Income
Year
or (Loss)
Petitioner
Seymour
Julius
Tobias
Esther
( a ) 1927
($2,108.85)
$1,500.00
$1,500.00
$1,500.00
$1,500.00
( a ) 1928
( 5,921.88)
2,600.00
2,600.00
2,600.00
2,600.00
( a ) 1929
( 3,827.12)
2,650.00
2,650.00
2,650.00
2,650.00
(a) 1930
3,685.44
3,584.10
3,584.10
3,584.10
3,584.10
(a) 1933
( 1,318.12)
2,600.00
2,600.00
2,600.00
2,600.00
(b) F/Y/E
( 1,764.75)
2,500.00
3,380.00
1,000.00
3,380.00
$700.00
6/30/36
(b) F/Y/E
995.72
2,915.00
2,915.00
2,915.00
2,915.00
6/30/38
(b) F/Y/E
607.87
2,860.00
2,860.00
2,860.00
2,860.00
6/30/39
(b) F/Y/E
350.11
(Officers' compensation not shown on return)
6/30/40
(b) F/Y/E
( 1,348.47)
(c)
3,120.00
3,120.00
3,120.00
6/30/41
(b) F/Y/E
7,810.86
(c)
5,120.00
5,120.00
5,120.00
6/30/42
*45 The Commissioner's records show that petitioner did not file income tax returns for the years 1926-1934, inclusive, 1936, 1940, and 1941; and that petitioner filed income tax returns for the years 1935, 1937, 1938, 1939, and 1942. That is to say, for the period of 17 years, 1926-1942, inclusive, petitioner filed returns for 5 years, and he did not file returns for 12 years. On the returns filed for 1935, 1937, 1938, and 1939, it was reported that no income tax was due. An unsigned copy of an income tax return for 1942 was produced during the trial of this case from the files of an accountant who testified that he prepared an income tax return for 1942 for petitioner. The copy of this return shows that no tax was reported. The record does not establish whether this copy is a copy of the return which was filed for 1942. In the returns filed by petitioner for 1935, 1937, and 1938, petitioner reported as his only income, salary from Samkoff's Sons, Inc., in the amounts of $2,500, $2,860, and $2,860, respectively. In his return for 1937 and 1938, petitioner *46 claimed a credit for his sister, Esther, stating that she was physically incapable of self-support. In the accountant's retained copy of an income tax return for 1942, income was noted from salary in the amount of $700, and income was noted from real estate at 533 East 133 Street, which was the address of M. Samkoff's Sons, Inc. The gross and the net amounts of the income which were noted as received from the property at 533 East 133 Street were $5,821, and $3,121,respectively. Petitioner filed income tax returns for 1943, 1944, and 1945. In these returns, net income of $600 was reported for 1943; gross income of $485 was reported for 1944; and a net loss of $275.32 was reported for 1945. In the return for 1943, petitioner claimed a personal exemption credit of $1,200, as head of a family and he noted that his sister, Esther, was a dependent. In this return, also, petitioner reported income of $250, as interest on a first mortgage (without identifying the mortgage), and income of $400 from "rents and royalties" (without describing the source of this income). That is to say, in the 1943 return, petitioner reported gross income of $650. No income from interest was reported. In *47 the return filed for 1944, petitioner reported gross and net rents from two pieces of real estate in the amounts of $5,640 and $240, respectively, and interest on a mortgage in the amount of $245 (without giving the addresses of the real estate or a description of the mortgages). In the return filed for 1945, petitioner reported gross rental income from two buildings located at 802 West 190 Street, a building and a garage, in the amount of $5,275, and a loss from the real estate (after deducting mortgage interest, taxes, expenses and depreciation) in the amount of $1,179; and he reported gain from sales of stock in seven corporations in the amount of $600.68, which he off-set against the loss from real estate, leaving a net loss of $578.32. Petitioner reported, also, $303 from dividends or interest (without explanation), against which loss of $578.32 was off-set, leaving a loss of $275.32. The address of the property from which rents were reported in petitioner's return for 1945 is the same address as petitioner gave as his own address on his returns for 1943, 1944, and 1945, namely, 802 West 190 Street, New York City 33, New York. For the years 1942, *48 1943, 1944, and 1945, respondent made up a statement of the assets, liabilities, and net worth of petitioner. The statement begins with petitioner's net worth as of December 31, 1941, and shows his net worth as of December 31, 1942, 1943, 1944, and 1945. By use of the so-called net worth plus cash expenditures method, the respondent determined that petitioner did not have any taxable income for 1944 (but sustained a loss of $2,626.23), and that for the years 1942, 1943, and 1945, petitioner's income was understated in the amounts of $11,535.88, $7,145.72, and $23,911.77, respectively. Respondent's net worth statement for petitioner comprises undisputed amounts of assets and liabilities as of December 31, 1941, 1942, 1943, 1944, and 1945. However, respondent's net worth statement does not include, among assets, any amount for undeposited cash on hand as of December 31, 1941, the beginning of the net worth statement, or as of December 31, 1942, 1943, 1944, and 1945. The entire "corrected net worth statement" of the respondent, upon which his determinations of deficiencies in income tax for 1942, 1943, and 1945 are based, is incorporated herein by this reference. (It is "exhibit A" *49 attached to the statutory deficiency notice, and it is part of respondent's exhibit D in the record of this case.) Respondent determined that petitioner's net worth as of December 31, 1941, amounted to $75,949.06. His determinations of the amounts of unreported income for 1942, 1943, and 1945 are as follows in his corrected net worth statement: Dec. 31, 1942
Dec. 31, 1943
Dec. 31, 1945
Inc. in net worth
$12,005.28
$20,810.25
$22,786.45
Living expenses, etc.
2,000.00
2,000.00
2,000.00
Totals
$14,005.28
$22,810.25
$24,786.45
Less: Gross income per returns
$ 734.40
$ 650.00
$ (275.32)
Depreciation
1,110.00
1,200.00
1,150.00
Capital gain
13,814.53
Cash bonus
625.00
Totals
$ 2,469.40
$15,664.53
$ 874.68
Understatement of net income
$11,535.88
$ 7,145.72
$23,911.77
The following schedule, taken from respondent's net worth statement, shows petitioner's assets, liabilities, and net worth, and increases in net worth, exclusive of alleged undeposited cash on hand, as of December 31, 1942, 1943, 1944, and 1945: Net Worth
Year
Assets
Liabilities
Net Worth
Increase
1941
$118,849.06
$42,900.00
$ 75,949.06
1942
138,071.01
50,116.67
87,954.34
$12,005.28
1943
143,297.92
34,533.33
108,764.59
20,810.25
1944
139,773.36
33,950.00
105,823.36
(2,941.23)
1945
222,484.81
93,875.00
128,609.81
22,786.45
*50 At the end of each of the years 1941 through 1945, petitioner had cash deposited in several banks, in savings accounts, and in one checking account, as follows: Total in
Total in
Total Cash
Savings
Checking
Year
in Banks
Accounts
Account
1941
$15,268.71
$14,465.99
$ 802.72
1942
29,490.66
29,188.22
302.44
1943
39,400.91
39,061.84
338.97
1944
34,159.35
33,876.02
283.33
1945
14,500.66
12,055.19
2,444.47 Some of the bank accounts were in the name "Sam Samkoff", "Samuel Samkoff", or "Sol Samkoff". Other bank accounts were in fictitious names, as follows: John Karp, Samuel Kaplan, Harry Newman, Samuel Cohn, Sol Cohen, and Samuel Cohen. Also, there was a bank account in the name of "Samuel Samkoff in trust for Julius Samkoff", and another bank account in the name of "Samuel Samkoff in trust for Esther Samkoff". During the period December 31, 1941 through December 31, 1945, from time to time, petitioner had 21 bank accounts, of which all were savings accounts, except one which was a checking account. The accounts were in 11 different banks. (The record does not give the full names of these banks.) The banks are identified in the net *51 worth statement (Exhibit D) as follows: Harlem, Bronx, Northside, Union Square, Lincoln, Empire City, Excelsior, Williamsburg, Dime, and National Bronx. All of the bank accounts were petitioner's bank accounts. At the end of 1941 and through each of the years 1942, 1943, 1944, and 1945, petitioner had a checking account in his own name at the National Bronx Bank. The balances in the checking account at the end of each of the years 1941 through 1945 were as follows: National Bronx Checking Account
Year
Balance
12/31
12/31
1941
$ 802.72
1942
302.44
1943
338.97
1944
283.33
1945
2,444.47
At the end of 1941, petitioner had seven savings accounts, three of which were in his own name and four of which were in fictitious names, or in the name of a trust. The total amount of the balances in the seven savings accounts amounted to $14,465.99, of which total amount $4,873.09 constituted the balances of the three savings accounts in petitioner's name, and $9,592.90 was the total balance of the accounts in other names. The savings accounts in petitioner's name were as follows: Accounts in Petitioner's Name
Harlem, No. 10107
$1,047.98
Northside, No. 129716
3,248.89
Bronx, No. 142991
576.22
$4,873.09
*52 The savings accounts in the Harlem, Northside, and Bronx banks in petitioner's name continued through the years 1942 and 1943, but at the end of 1944 and 1945 there was no balance in any of these accounts. The balances in these accounts showed some increase at the end of 1942 and 1943, as follows: Accounts in Petitioner's Name
Bank
Dec. 31, 1942
Dec. 31, 1943
Harlem, No. 10107
$3,762.83
$3,828.95
Northside, No. 129716
3,449.85
3,490.47
Bronx, No. 142991
820.95
835.36 The savings accounts standing in the names of persons other than petitioner, the names in which the accounts were carried, and the amounts thereof at the end of 1941, 1942, and 1943 were as follows: Accounts in Others' Names
Bank
Name
12/31/41
12/31/42
12/31/43
Dollar, No.
146893 John Karp
$4,465.24
$ 4,742.76
$ 4,866.80
Bronx, No.
159887 John Karp
3,507.42
4,213.41
4,287.45
Harlem, No.
490789 Sol Samkoff
1,574.20
1,621.88
1,758.59
Bronx, No.
144348 S. Kaplan i/t Esther
46.04
844.49
978.38
Samkoff
Total
$9,592.90
$11,422.54
$11,891.22
The balances in the savings account in petitioner's own name, in the banks indicated above, *53 at the end of 1942 and 1943 were as follows: Accounts in Petitioner's Own Name
Bank
Dec. 31, 1942
Dec. 31, 1943
Harlem, No. 10107
$3,762.83
$3,828.95
Northside, No. 129716
3,449.85
3,490.47
Bronx, No. 142991
820.95
835.36
Totals
$8,033.63
$8,154.78
At some time in 1942, petitioner opened two savings accounts, one in the Dollar Bank and one in Union Square, in the name of Samuel Kaplan; and he opened a new savings account in his own name in Harlem. There were balances in these three savings accounts at the end of 1942 and 1943, but there were no balances in these accounts at the end of 1944 and 1945, and, therefore each of these accounts was closed at sometime in 1944. The balances in these accounts at the end of 1942 and 1943 were as follows: Account in Own Name
Bank
Name
Dec. 31, 1942
Dec. 31, 1943
Harlem, No. 100361
$5,125.50
$5,215.37
Accounts in Others' Names
Dollar, No. 561654
Samuel Kaplan
$ 603.00
$1,282.57
Union Square, No. 287468
Samuel Kaplan
4,003.35
4,772.28
$4,606.35
$6,054.85
During 1943, petitioner opened six new savings accounts all of which were opened in the names of others. *54 The total amount of the balances of these six savings accounts at the end of 1944 was $7,745.52. The accounts were opened in the following names: Harry Newman, Samuel Cohn, Samuel Kaplan, Sol Cohen, and John Karp. Four of these accounts were carried through the year 1944, and two were carried through both 1944 and 1945. In 1944, petitioner opened two savings accounts in the names of others. The total amount of the balances in these new accounts at the end of 1944 was $8,816.55. One of these new accounts was opened in the name of Samuel Cohen, and the other was opened in the name of Harry Newman. There was no balance in the savings account opened in the name of Samuel Cohen at the end of 1945. There was a balance at the end of 1945 in the amount of $89.90 in the account opened in the name of Harry Newman. In 1945, petitioner opened two new savings accounts, one in his own name and one in the name of Sam Samkoff in trust for Julius Samkoff. The balance in these two new savings accounts at the end of 1945 was $8,058.10. The following schedule shows the balances at the end of 1943, 1944, and 1945 of new savings accounts which petitioner opened in various banks in 1943, 1944, and *55 1945: Accounts in Others' Names Opened in 1943
Bank
Name
12/31/43
12/31/44
12/31/45
Union Sq. No. 290954
Harry Newman
$1,126.14
Lincoln No. 8198
Samuel Cohn
40.20
$ 6,152.64
Empire No. 390846
Samuel Kaplan
1,015.04
Excelsior No. 241564
Sol Cohen
2,542.41
6,785.84
$1,667.44
Williamsburg No. 215206
John Karp
1,102.99
5,957.58
Williamsburg No. 909837
Sol Cohen
1,918.74
6,163.41
2,240.75
$7,745.52
$25,059.47
$3,908.19
Accounts in Others' Names Opened in 1944
Williamsburg No. 220507
Samuel Cohen
$5,934.30
Dime No. 253823
Harry Newman
2,882.25
$89.90
$8,816.55
$89.90
Accounts Opened in 1945
Dollar No. 590987
Sam Samkoff i/t
$4,558.10
Julius Samkoff
Dollar No. 589515
Sam Samkoff
3,500.00
$8,058.10
Petitioner's assets as of December 31, 1941, at cost, in addition to $15,268.71, cash in various banks, amounted to $103,580.35, and consisted of stock in M. Samkoff's Sons, Inc., $10,000; real estate at 131 East 113 Street, $43,000; and real estate on Bruckner Boulevard, Bronx, $50,580.35. Petitioner's liabilities as of December 31, 1941 amounted to $42,900, and consisted of mortgage *56 on 131 East 113 Street, $15,700; first mortgage on Bruckner Boulevard property, $20,000; second mortgage on Bruckner Boulevard property, $2,200; and a loan payable to M. Samkoff's Sons, Inc., $5,000. Petitioner's assets and liabilities as of December 31, 1942, were as follows: December 31, 1942
Assets
Cash in banks
$ 29,490.66
Loan receivable
5,000.00
Stock, M. Samkoff's
10,000.00
131 E. 113 Street
43,000.00
Bruckner Blvd.
50,580.35
$138,071.01
Liabilities
Mtge. 113 St.
$ 15,700.00
1st Mtge. Bruckner
19,416.67
Loan Payable - Samkoff's, Inc.
15,000.00
$ 50,116.67
Petitioner's assets and liabilities as of December 31, 1943, were as follows: December 31, 1943
Assets
Cash in banks
$ 39,400.91
Loan receivable
4,900.00
Merchandise
5,416.66
131 E. 113 St.
43,000.00
Bruckner
50,580.35
$143,297.92
Liabilities
Mtge. 113 St.
$ 15,700.00
1st Mtge. Bruckner
18,833.33
$ 34,533.33
Petitioner's assets and liabilities as of December 31, 1944, were as follows: December 31, 1944
Assets
Cash in banks
$ 34,159.35
Loan receivable
4,800.00
Merchandise
5,416.66
100 shs. Rustlers stock
1,817.00
131 E. 113th St.
43,000.00
Bruckner Blvd.
50,580.35
$139,773.36
Liabilities
Mtge. 113 St.
$ 15,700.00
1st Mtge. Bruckner
18,250.00
$ 33,950.00
*57 Petitioner's assets and liabilities as of December 31, 1945, were as follows: December 31, 1945
Assets
Cash in banks
$ 14,500.66
Loan receivable
4,700.00
100 shs. Paige stock
1,528.80
131 E. 113 St.
43,000.00
Bruckner
50,580.35
99 Marble Hill Ave.
108,175.00
$222,484.81
Liabilities
Mtge. 113 St.
$ 15,700.00
1st Mtge. Marble Hill
63,125.00
2nd Mtge. Marble Hill
15,050.00
$ 93,875.00
Prior to the issuance of the statutory notice, several conferences were held in the office of the Appellate Division of the Commissioner's office at which the petitioner and, or, his authorized agents were present. At the request of the Commissioner's representative, Riegelhaupt, a net worth statement was submitted by petitioner's authorized agent, Frishkoff, setting forth petitioner's net worth on December 31, 1942, 1943, 1944, and 1945. That net worth statement (exhibit R) contained only nine of the petitioner's bank accounts. It included no cash, other than in bank accounts, other than an item "other cash (Passbooks not now available) approximately $20,000," as of December 31, 1944. The statement also included as a deduction from total assets on December 31, 1945, an *58 amount of $34,000, "Received from Esther Samkoff." In this statement, petitioner reported as of December 31, 1942, 1943, 1944, and 1945, total assets and liabilities as follows: 1942
1943
1944
1945
Total assets
$115,815.80
$105,126.42
$109,700.33
$128,157.80
Liabilities
On May 28, 1951, petitioner executed a power of attorney to George Nodelman. Thereafter, Riegelhaupt requested Nodelman to submit a net worth statement, sworn to by the petitioner. In the meantime, Riegelhaupt telephoned Nodelman and discussed the subject of the names used by petitioner on his bank accounts. Nodelman said that petitioner was in his office and had told him that he couldn't remember using any names other than Sol or Samuel Kaplan. On November 27, 1951, a net worth statement (exhibit M), signed by the petitioner, was received by Riegelhaupt. This statement sets forth 16 out of 21 of the petitioner's bank accounts and included an item of cash on hand, not in banks, as of December 31, 1941, only, in the amount of $7,500. The item with respect to Esther on this statement was shown as "Loans Payable - Esther Samkoff," $14,435.88 on each of the dates, December 31, 1944 and *59 December 31, 1945. The total assets listed were close to but not the same as respondent has determined. Thereafter, Riegelhaupt asked for a statement explaining how petitioner accumulated the amount of $7,500 which he claimed as cash on hand, not in banks, at the beginning of the net worth period. As a result, Nodelman submitted a statement which explained that petitioner had accounts in the Bronx Savings Bank, Dollar Savings Bank, and Harlem Savings Bank, prior to 1941, and that one Corcilo had paid off a debt of $2,500, due to petitioner in 1941 (exhibit T). Some time later, on February 18, 1943, a third net worth statement was submitted to Riegelhaupt (exhibit U). That statement shows for the first time mortgage indebtedness, and also, five additional bank accounts, two of which were held in the name of Sol Cohen and the others in the names of Samuel Cohen, John Kash and Harry Zimman, respectively. The record does not establish that petitioner had any bank accounts in the name of Kash or Zimman. The amount of unbanked cash was given again as $7,500, on December 31, 1941, only, and the alleged loan from Esther remained the same as shown on the second statement, $14,435.88. The *60 amounts of assets at the end of each year differed from the amounts shown in the previous "net worth" statements. Following the submission of the above statement, petitioner submitted an affidavit in which he again purported to explain the accumulation of the claimed cash on hand, December 31, 1941, of $7,500. In the affidavit (exhibit N), he stated that he had received a check for $1,500 in May 1940, which he cashed; that in May 1939 he made a loan of $1,100, which was repaid in monthly instalments in approximately one year; that he cashed checks for $2,300, $1,068.97 and $539.51, in February 1941, August 1939, and February 1939, respectively, and that he gave $2,438.02 to a bonding company, as security, in January 1938, which sum was returned to him about three years later by check, which was cashed. The items total $8,946.50. In November 1942, petitioner loaned approximately $5,000 to Bessie Levinstim, who was represented by a lawyer, Sigmund Metz, and took back a mortgage as security. The mortgage terms included provision for interest at 6 per cent. At the closing of the transaction, petitioner demanded a bonus of $625. Metz drew his own check for that amount; cashed it, and *61 turned over the money to petitioner. Petitioner did not report this income on his income tax return. On June 30, 1943, the corporation, M. Samkoff's Sons, Inc., purchased the stock of petitioner, Esther, and Julius for a total amount of $68,897.87, which represented the cancelation of loans receivable from the shareholders of $52,647.87, and the receipt by the shareholders of merchandise in the total amount of $16,250. Included in the loans receivable was $18,300 due from petitioner. This last amount was composed of loans as follows: $5,000, August 31, 1940; $5,000, July 1942; $5,000, December 1942; $2,500, February 1943; $800, May 1943, Petitioner received one-third of the merchandise having a value of $5,416.66. The total consideration received by the petitioner, therefore, was $23,716.66. The cost of petitioner's shares was $10,000. Respondent determined a capital gain of $13,716.66, taken into account at 50 per cent. Petitioner did not report this transaction, or any gain therefrom, on his income tax return. Petitioner transferred his funds, during some of the years 1942-1945, from bank to bank to obtain better interest rates. Some banks paid interest at the rate of 2 3/4 per *62 cent, others paid 3 per cent interest. Petitioner did not report interest from savings accounts in his income tax returns. Petitioner testified that he received monthly income from rentals in each of the years in question of $150 or $200 a month. On his 1942 return, he reported gross rental income of $5,821, in schedule B, and net profit of $3,121. He also reported salary income of $700, and claimed deductions for interest and taxes of $3,086.60, or a total net income of $734.40. The merchandise received as part of the consideration for his sale of stock in M. Samkoff's Sons, Inc., was sold in 1945. The record does not disclose what was received from the sale. Petitioner did not keep any books or records relating to his rental income, income from the sale of the merchandise, or income from any other sources. Petitioner lent money, in the form of cash, but he kept no books or records relating to such transactions. On November 28, 1939, petitioner pleaded guilty to a charge of failure to file his New York State income tax return for 1937. On March 27, 1940, petitioner was sentenced to four months in prison for perjury. Petitioner's books and accounting records, such as they *63 were, were not adequate, and the method of accounting regularly employed by petitioner, such as it was, in keeping his records of his income did not clearly reflect petitioner's income. Petitioner's cash expenditures for living expenses and nondeductible disbursements amounted to at least $2,000 in each of the years 1942-1945, inclusive. As is shown herein, above, there was a first mortgage of $20,000, and a second mortgage of $2,200 outstanding on one of petitioner's pieces of property, located on Bruckner Boulevard, at the end of 1941. The second mortgage was paid during 1942; payments on the first mortgage were made in 1942, 1943, and 1944; and the balance of the first mortgage, $18,250, was paid during 1945. No reductions on the mortgage of $15,700, on the property at 131 East 131 Street, were made during the years 1942-1945, inclusive. Petitioner became ill in February 1942. His illness was caused by sinus trouble and an operation resulted in the loss of one eye. Petitioner was in a hospital for two months. During 1945, petitioner acquired real estate located at 99 Marble Hill Avenue. The cost of the property was $108,175; the property was subject to a first mortgage of *64 $63,125, and a second mortgage of $15,050, or total mortgages of $78,175. At the end of 1941, petitioner had cash savings on hand, not deposited in banks, in the amount of not more than $7,500. Part of the deficiency for each of the years 1942, 1943, and 1945, was due to fraud with intent to evade tax. The stipulation of facts is incorporated herein by this reference. Opinion HARRON, Judge: The Commissioner's net worth statement sets forth items of assets and liabilities which petitioner admits are correct as to individual items and amounts as of the end of the years 1941-1945, inclusive. Petitioner admits that he had savings accounts and a checking account in various banks, that he owned some securities in some of the years, and that he owned real estate. Petitioner contends, however, that the Commissioner's net worth statement is incorrect because there is no inclusion in his assets at the end of 1941 of cash, undeposited in banks, in the amount of $45,000. He contends that he had this sum of cash at the end of 1941 and that it was kept in a safe in the office of the Samkoff's Sons, Inc., corporation. It is upon this contention that petitioner chiefly relies in contesting *65 the deficiencies. Petitioner's explanation of his alleged accumulation of cash is simply that during the years prior to 1942 he lived frugally, to an extreme degree, and saved his earnings derived from the Samkoff grocery business. Petitioner called his younger brother, Seymour, as a witness. Seymour testified that in 1942, before petitioner underwent surgery, petitioner asked him to look after cash which was located in the safe in the corporation's office, and that together Seymour and petitioner counted close to $42,000 located in a small vault, or compartment, in the safe, and that this amount of money was in the safe after petitioner returned from the hospital. Petitioner's purpose in calling his brother Seymour was to corroborate petitioner's assertion that he owned and possessed $45,000 in undeposited cash at the end of 1941 and in 1942. The inference we are asked to make from Seymour's testimony is that the accumulation of money which he testified was counted in his presence and with his assistance belonged to petitioner. But we are unable to make this inference. Seymour was not asked whether he knew who owned the accumulation of $42,000. Apart from a question raised by *66 the respondent about the credibility of Seymour's testimony, which we need not decide, and assuming that there was $42,000 in the corporation's safe in 1942, there is no proof of the ownership thereof other than petitioner's self-serving declaration to that effect. The family-owned corporation and business was one in which petitioner's brothers Tobias and Julius participated and had interests, as well as his sister, Esther, in 1942, but neither Tobias, Julius, nor Esther gave testimony. Moreover, the Samkoff's Sons corporation was engaged in business in 1942 and an obvious question may be raised as to whether all or part of the cash in its safe, located in its office, belonged to the corporation. There are several circumstances which cast serious doubts upon petitioner's claim that he owned $45,000 at the end of 1941. For example, it is observed that the statutory deficiency notice was mailed on May 28, 1954, to which the respondent's net worth statement was attached. Prior to the receipt of the deficiency notice and the net worth statement, petitioner did not know the amounts of unreported income which respondent's use of the net worth plus expenditures method would produce. It *67 was not until after the issuance of the deficiency notice that petitioner made a claim that he owned $45,000 undeposited cash at the end of 1941. On the other hand, in a sworn statement and in schedules of assets and liabilities which petitioner submitted to the agent in 1953 and at other times prior to May 28, 1954, petitioner made no claim that he had at the end of 1941 any sum of undeposited cash which approximated $45,000. To the contrary, he claimed to have had only $7,500 at the end of 1941 in two of his statements of assets, whereas in his first he made no claim to having any undeposited cash. He did not claim to have any undeposited cash on hand at the end of 1942, 1943, or 1944. Petitioner has failed to give any details about the manner in which he accumulated the alleged $45,000. In petitioner's income tax returns for years prior to 1941, of which only a few were filed, petitioner reported comparatively small amounts of income. According to income tax returns filed by the Samkoff corporations petitioner's annual salary from 1927 ranged from $1,500 to around $3,500. Upon consideration of the entire record, it is concluded that petitioner's claim that he owned undeposited *68 cash in the amount of $45,000 at the end of 1941 is not worthy of belief, is not credible, and is untruthful. The contention is rejected. . However, consideration has been given to petitioner's age, to the fact that he had been gainfully occupied for many years before 1942, and to petitioner's two statements of assets which were made before the receipt of the deficiency notice. Giving the most weight which properly can be given to the claim of petitioner that he had undeposited cash at the end of 1941, it is concluded that petitioner had $7,500 undeposited cash at the end of 1941, and we have so found. The respondent has determined that petitioner had unreported income of $11,535, $7,145, and $23,911 (round figures) for 1942, 1943, and 1945, respectively. The respondent's determination places upon the petitioner the burden of overcoming by competent proof the prima facie correctness of these determinations. It is concluded that petitioner has failed to discharge his burden of proof, except as to the item of $7,500 undeposited cash at the end of 1941. It is recognized that respondent's determination has been made by use of the *69 socalled net worth method, and that the use of the net worth method involves difficulties which "require the exercise of great care and restraint." . The petitioner failed to keep adequate books and accounting records in the taxable years and in prior years. The respondent was justified in resorting to the net worth method. Cf. , affd. ; ; ; . Petitioner has not produced any accounting records. He did not maintain and keep accounting books. It is to take a liberal view to credit petitioner with keeping even informal accounting records. Such as these were, they appear to have been only his bank deposits books and records of mortgage payments. Such records were inadequate to clearly reflect petitioner's income. Petitioner had sources of income other than earnings. He loaned money, he owned rental property, and in 1944, he owned grocery merchandise which he sold, yet he kept no accounting record of income from *70 these sources. During the trial of this case, petitioner failed to convince that he was forthright and frank. For example, he failed to present facts about gross and net rent receipts from the real estate at 131 East 113 Street and on Bruckner Boulevard, about sources of payments on mortgages, about the payment in 1945 of the balance of $18,250 on the first mortgage on Bruckner Boulevard, and about the transaction involving the purchase in 1945 of the property at 99 Marble Hill Avenue. Petitioner did not deny that he received rents from the two pieces of real estate mentioned above. We are not impressed with the suggestion that petitioner is incapable, for lack of education, to present facts fully and frankly about his finances in the taxable years. Petitioner has had many years of business experience which is in itself a good teacher. Petitioner has failed, on the whole, in his burden of proof. . The respondent's determinations of the amounts of unreported income for the taxable years are sustained, subject to adjustment for the allowance of undeposited cash of $7,500 at the end of 1941. The next question is whether any part of *71 each deficiency is due to fraud with intent to evade tax. The deficiency for 1942 is barred unless a false or fraudulent return with intent to evade tax was filed for 1942. It is concluded that the respondent has sustained his burden of proof in establishing fraud. Petitioner has been engaged in business activities for many years. He did not maintain books and records from which his income could be determined. His net income was substantially understated in each of the taxable years. There is evidence that his explanation of his assets varied from time to time during the course of respondent's examination of his returns. Petitioner failed to reveal to respondent's agent, in the first instance, that he had savings accounts in fictitious names. We think the evidence is clear and convincing that the deficiencies are due at least in part to fraud with intent to evade tax, and have so found. ; ; . Decision will be entered under Rule 50. Footnotes
a. Max Samkoff and Sons, Inc. ↩
b. M. Samkoff's Sons, Inc. ↩
c. Petitioner not shown on return as paid officer.↩